Salvation Army Case.

Argued November 29, 1943. Before MAXEY, C. J.,
DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*John W. Kephart,* with him *Gifford K. Wright,* of *Alter, Wright & Barron,* for appellant.

*Herman Lipsitz,* for appellee.

*George L. Reed,* with him *M. Louise Rutherford,* Deputy Attorney General, and *James H. Duff,* Attorney General, for Commonwealth, intervenor.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, March 20, 1944:

This appeal involves the construction of the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, as amended by the Act of June 9, 1939, P. L. 293, 43 PS section 211.1 *et seq.* The pivotal question is whether the Salvation Army, operating within the scope of its authority as a corporation of the first class, not for profit, is within the purview of the Act. This in turn depends upon whether or not the terms of the Act relate exclusively to *industrial disputes.*

In *Western Pennsylvania Hospital et al. v. Lichliter et al.,* 340 Pa. 382, 17 A. 2d 206, we affirmed, per curiam, the judgment of the Common Pleas Court of Dauphin County, which decided that the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, as amended by the Act of June 9, 1939, P. L. 302, 43 PS section 206, and the Pennsylvania Labor Relations Act, supra, *related exclusively*

*to employers and employes engaged in industrial pursuits.* Appellees maintain with much earnestness that the Western Pennsylvania Hospital case, supra, merely determines that a hospital receiving state aid is not within the purview of the Labor Relations Act, and that this decision is not applicable to the present facts.

In the instant case, a petition was presented by a union of hotel and restaurant employes to the Labor Relations Board asserting that the Salvation Army was engaged in the hotel and restaurant business at The Evangeline Residence in Pittsburgh, employing approximately twenty-eight employes, and had declined to bargain collectively. Petitioner prayed that the Board, under Section 7 (c) of the Act, investigate the matter and certify the name or names of the representatives who have been designated or selected for the purpose of collective bargaining by the majority of the employes in a suit appropriate for such purposes. This was resisted by the Salvation Army. After hearing, the Board decided that the Army was an "employer" within the meaning of Section 3, sub-section (c) of the Act, and ordered an election to ascertain representatives for the purpose of collective bargaining. Upon exceptions, the Board, in a comprehensive opinion, dismissed the exceptions and re-affirmed the order. A petition for review was then presented to the Court of Common Pleas, and after hearing, a majority of the court, in an opinion by SMITH, J., concurred in by RICHARDSON, J., with THOMPSON, J., dissenting, affirmed the order. The present appeal followed.

There is a finding of fact, to which no exception was taken, "That the Evangeline Residence is operated to afford young working girls and out-of-town school girls with Christian surroundings, and though rates, estimated to cover costs are charged, the operation is not conducted for profit (N. T. 7, 11)." It is therefore conceded that the Salvation Army is not conducting this activity as an *industrial pursuit,* but wholly within the scope of its charter as a purely charitable enterprise.

In the Western Pennsylvania Hospital case it was decided that the Labor Relations Act did not apply where there was no *industrial* dispute. Judge RICHARDS based his opinion upon two grounds: (1) that a hospital receiving *state aid* was exempted from the terms of the Act by Section 3, sub-section (c) as it was performing a governmental function and (2) that the Act did not apply to non-industrial disputes.

The Pennsylvania Labor Relations Act was designed to protect the rights of employes to organize and bargain collectively and, by its express terms, the Act must be liberally construed. In construing the Act, however, this Court is limited to ascertaining and effectuating the true intention of the legislature. If the words of this Act are clear and free from all ambiguity, we cannot disregard its letter under a pretext of pursuing its alleged spirit. *Farmers-Kissinger Market House Co., Inc., v. Reading,* 310 Pa. 493, 165 A. 398; *Orlosky v. Haskell,* 304 Pa. 57, 155 A. 112. On the other hand, if the words of the Act are not explicit, this Court cannot, under the guise of statutory construction, so broaden the operative scope of the Act that our construction of it amounts, in effect, to judicial legislation: see *Appeal from Ordinance, Pittsburgh,* 99 Pa. Superior Ct. 467, 471, affirmed in *Snyder's Appeal,* 302 Pa. 259, 153 A. 436. The function of this Court is limited solely to interpretation and, as an aid in such interpretation, consideration may be given to: (1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the consequences of a particular interpretation: *Orlosky v. Haskell,* supra; *Blake v. Wilson,* 268 Pa. 469, 474, 112 A. 126.

Under the guidance of these principles we have reexamined the text of the Labor Relations Act. Section 2 reads as follows: "Findings and Policy.—(a) Under prevailing economic conditions, individual employes do not possess full freedom of association or actual liberty

of contract. Employers in many instances, organized in corporate or other forms of ownership associations with the aid of government authority, have superior economic power in bargaining with employes. This growing inequality of bargaining power substantially and adversely affects the general welfare of the State by creating variations and instability in competitive wage rates and working conditions *within and between industries,* and by depressing the purchasing power of wage earners, thus—(1) creating *sweat-shops* with their attendant dangers to the health, peace, and morals of the people; (2) increasing the disparity between *production and consumption;* and (3) tending to produce and aggravate recurrent *business depressions.* The denial by some employers of the right of employes to organize and the refusal by employers to accept the procedure of collective bargaining tend to lead to strikes, lock-outs, and other forms of *industrial* strife and unrest, which are inimical to the public safety and welfare, and frequently endanger the public health.

"(b) Experience has proved that protection by law of the right of employes to organize and bargain collectively removes certain recognized sources of *industrial strife and unrest,* encourages practices fundamental to the friendly adjustment of *industrial disputes* arising out of differences as to wages, hours or other working conditions, and tends to restore equality of bargaining power between employers and employes . . ."

In the light of these plainly expressed legislative findings declaring the necessity for the law and the mischief to be remedied, we are drawn irresistibly by the language used to the conclusion that the legislature meant to limit its provisions to *industrial pursuits.* The phrases: *"within and between industries"; "sweat shops", "production and consumption", "business depressions"* and *"industrial strife and unrest"* certainly do not relate to charitable or eleemosynary associations. It appears too plain for argument that the legislature intended all

of the statutory provisions and regulations of the Act to apply exclusively to *industrial* disputes.

It is asserted that several states have adopted a different construction. The text of the acts in these states has not been submitted, although various opinions of foreign appellate courts have been cited and quoted. Much can be said for the view that a labor relations act should include *all* labor except where specifically excepted. It is to be observed, however, that our decision in the Western Pennsylvania Hospital case, decided on January 6, *1941,* granted charitable institutions an implied exclusion from the operation of the Act and, unless amended by the legislature, this Court's construction of an act has the same effect as if written into the body of the statute at the time of its enactment: *Lerch's Estate,* 309 Pa. 23, 28, 159 A. 868; see *Buhl's Estate,* 300 Pa. 29, 32, 150 A. 86; *Barnes Foundation v. Keely et al.,* 314 Pa. 112, 126, 171 A. 267. If our interpretation were not consonant with the legislative purpose, it was within the power of the legislature to amend the Act in order to effectuate that purpose. It is most significant, there-, fore, that two legislatures have convened and adjourned since our former decision, and no amendment to the Act, as construed by us, has been enacted by the legislative body. See *Chester School District's Audit,* 301 Pa. 203, 214, 151 A. 801; *Lower Nazareth Twp. App.,* 341 Pa. 171, 175, 19 A. 2d 92.

We do not mean to decide or imply that whenever a non-profit organization does enter an industrial field, even though its profits may be devoted to charity, it is exempted from the taxes and regulations such as the Labor Relations Act to which any other industry or business is subjected. Compare: *Y. M. C. A. of Germantown v. Philadelphia,* 323 Pa. 401, 187 A. 204, in which the Y. M. C. A. rented commercially part of its premises to lodgers; *The Contributors to the Pennsylvania Hospital v. The County of Delaware et al.,* 169 Pa. 305, 32 A. 456, in which a private hospital operated farms for

profit; *American Sunday School Union v. Philadelphia,* 161 Pa. 307, 29 A. 26, in which a Sunday school union conducted a book store for profit: *Trustees of Columbia University, etc.,* Decision No. 2552, Case No. SE-9232, of the State Labor Relations Board of New York, in which a university owned and operated an office building. See *Penna. Co., etc., Tr., v. Philadelphia et al.,* 346 Pa. 406, 31 A. 2d 109.

The order of the court below is reversed, and is here entered in favor of the appellant; costs to be paid by the appellees.