## Coxe v. Commonwealth

*Walter E. Alessandroni*, Attorney General, and *Raymond Kleiman* and *Edward Friedman*, Deputy Attorneys General, *Warren G. Holmes* and *Herman E. Cardoni*, for Commonwealth.

*Michael A. Madar*, for General State Authority.

*Gerald H. Goldberg* and *Lois G. Forer*, for plaintiff.

SOHN, P. J., March 24, 1964.—This case concerns a most peculiar complaint in equity in which the Court of Common Pleas of Dauphin County is required to enjoin defendants and each of them from entering into

contracts concerning the performance whereof the recruitment and hiring of employes might be discriminatory. It likewise seeks that defendants be enjoined, each of them, from expending public moneys for any project in the performance whereof recruitment of employes might be conducted on a discriminatory basis. It also seeks to enjoin defendants from reimbursing public moneys to any school district within the Commonwealth which might practice discriminatory educational programs. It requests this court to retain jurisdiction until defendants award all contracts wherein recruitment was not discriminatory and wherein all educational programs were similarly conducted. The complaint, however, does not allege any present existing discriminatory practice on the part of any main defendant or of any other person.

Defendant, The General State Authority, and members thereof filed preliminary objections. The Commonwealth of Pennsylvania and other named defendants, to wit: William W. Scranton, Governor of the Commonwealth of Pennsylvania; Thomas Z. Minehart, Auditor General of the Commonwealth of Pennsylvania; Grace Sloan, Treasurer of the Commonwealth of Pennsylvania; Charles H. Boehm, Superintendent of the Department of Public Instruction; and Richard M. Hornbeck, Secretary of the Department of Property and Supplies of the Commonwealth of Pennsylvania, likewise filed preliminary objections, through the Attorney General, raising, inter alia, a question of jurisdiction; the standing of plaintiff to sue; and the failure of plaintiff to state a cause of action and to join indispensable parties.

Three principal questions seem to be involved in this case.

1. Does equity have jurisdiction to grant injunctive relief where the complaint fails to state the cause of action but avers only assertions of plaintiff's beliefs as

to the existence of certain conditions and his conjecture as to the happening of future events?

2. Does plaintiff have available a full, complete and adequate remedy at law thereby avoiding any necessity for granting equitable relief?

3. Where plaintiff fails to qualify to maintain the action and fails to join the sole and indispensable parties to the action, is the court warranted in dismissing the complaint?

Plaintiff's complaint here is in effect a request for injunctive relief because he merely speculates that certain happenings will occur in the future which will be in violation of the anti-discrimination laws of this Commonwealth and which might result in the unlawful expenditure of public funds. The complaint fails, however, to set forth in what particulars these violations will occur or who will be the violators. Plaintiff merely voices suspicions that discriminatory practices will take place, but fails to specify where or in what manner they will arise. Moreover, plaintiff does not allege that there are any present violations nor does he allege any wrongdoing by any or all of the named defendants. However, he does request of this court that we enjoin defendants from engaging in these' "practices" as well as from making any payments of' public moneys to those who might violate the laws. He finally requests the court to retain jurisdiction of this action until these conditions are met. We think that it cannot be denied that courts of equity have traditionally been concerned with those phases of the law which deal with the prevention of irreparable harm and injury by injunction. Heretofore, equity has always avoided taking jurisdiction over matters which are mere abstractions of thought and which allege conjectured claims unsupported by precise allegations of present or imminent harm or injury to the person requesting such equitable relief.

In order for a complainant to be entitled to equitable relief, his right thereto must be clear and not open to conjecture or speculation or where any anticipated injury is doubtful: United States v. Bigan, 274 F. 2d 729 (1960); Schuylkill Trust Company v. Schuylkill Mining Company, 358 Pa. 535 (1948). These are the fundamental reasons why plaintiff has failed to state a cause of action upon which relief can be granted and over which this court has jurisdiction.

Plaintiff's averments, beliefs or expectations that said public officials are entering or are about to enter into and enforce contracts providing for discriminatory recruitment and hiring in violation of the laws which they are sworn to uphold is a gross affront to all of the defendants which they cannot fail to resent. Plaintiff nowhere alleges that defendants or any of them are engaged or are about to engage in any unlawful conduct regarding hiring or recruitment. Plaintiff has no basis for these allegations because the named defendants are not an employing agency or employer but solely award contracts. In all government contracts, provisions are specifically inserted to prohibit discriminatory activity in hiring and recruitment of help. See the Act of July 18, 1935, P. L. 1173, 43 PS §153; and the Act of March 10, 1949, P. L. 30, 24 PS §7-755. If such practices do occur, then it is the governmental entity, as one in privity, who can seek redress for violation of the contractual relationship. Heavy penalties are provided for a violation of these anti-discriminatory provisions.

It is necessary for us to point out in this connection that any aggrieved person can seek redress for discriminatory activities by pursuing his grievances before the administrative body which has been specifically established by the legislature to promote the policy of anti-discrimination. The Pennsylvania Human Relations Commission created by the Act of October

27, 1955, P. L. 744, administers and enforces the provisions of the Pennsylvania Human Relations Act of February 28, 1961, P. L. 47, 43 PS §§951-963, and the Pennsylvania Fair Educational Opportunities Act of July 17, 1961, P. L. 776, 24 PS §§5001-5010. Reference to these statutes will reveal the extent to which the legislature went in providing a full, complete and adequate legal remedy to any aggrieved individual. However, any complaint brought before the commission must have some specific grievance set forth therein and not contain mere conjectural statements as to the anticipated happening of future events. In addition, such a complaint before the court must have the same attributes. An examination of the pleading reveals that plaintiff has not alleged any definable irreparable harm or injury, past, present, or future, which could form the basis for equitable relief. Paradoxically, however, he has asked this court to retain jurisdiction of his action in the expectation or fear that future events will warrant intervention by a court of equity.

The plaintiff has also alleged denial of fair educational opportunities by certain unnamed school districts. School districts, as political entities of the Commonwealth, are administered by a school board whose public officers are presumed to uphold not only the Constitution but also the laws of this Commonwealth in order to insure that a thorough and efficient system of public schools be maintained. In the unlikely or unfortunate event that certain school boards are not implementing the public policy of this Commonwealth, then any aggrieved person can seek complete redress at law before the commission.

It is important to reemphasize the futility of this complaint. Much mention is made that these discriminatory practices, both in employment and education, will "in all likelihood" result in work stoppages and demonstrations to the irreparable loss of plaintiff's

tax moneys. But such activities have not occurred and there has been no expenditures of public moneys in connection with such occurrences. Equity has at times retained jurisdiction over causes of action, but only where irreparable injury and harm have been demonstrated and which will recur. Jurisdiction should not be retained over a matter which has not reached any stage of overtness. The suggested acts of violence, work stoppages and the like have not occurred, and defendants are entirely at a loss as to where plaintiff expects them to occur or which school districts are specifically expected to engage in denying equal educational opportunities.

In the final analysis, plaintiff here seeks to use this court as a vehicle to air his alleged dissatisfaction with anticipated practices of certain unnamed parties. He has shown no irreparable harm or injury to himself or to anyone else, and has alleged no wrongdoing by the named defendants or any of them. His fear or expectation that certain events may happen in the future does not state a cause of action over which this court has jurisdiction. Accordingly, we must dismiss said complaint.

But there is another fundamental reason why this complaint on the part of plaintiff must be dismissed. In short, plaintiff has available to him a full, complete and adequate remedy at law which will provide the relief which he is requesting.

The Pennsylvania Human Relations Commission was established to administer and enforce the Pennsylvania Human Relations Act, supra. It is a public body which entertains and investigates complaints brought before it of a discriminatory nature much like the complaint which is sought to be circuitously raised in this case. Not only is it the administrative arm of the program which the legislature has adopted, but its jurisdiction extends to all employers, including the

Commonwealth. In fact "employer" as defined in Section 4(b) includes "the Commonwealth or any political subdivision or board, department, commission or school district thereof . . ." 43 PS §954(b).

Likewise, the Commonwealth cannot be sued without its consent in an action in equity seeking injunctive relief: Williamsport & Elmira Railroad Co. v. Commonwealth, 33 Pa. 288 (1859). Therefore, this court has no power or jurisdiction to restrain the Commonwealth from its activities and for this additional reason plaintiff's complaint must be dismissed. The fact that the Commonwealth can be sued in an action before the commission should conclusively demonstrate the effectiveness of the remedy at law.

What appears all the more anomalous about this action, however, is the fact that the named defendants are not an "employer," but solely an awarding or disbursing agency of public funds. It is clear that an appropriate remedy is available against the very people whom plaintiff alleges will engage in these discriminatory practices—the unnamed contractors, labor organizations and school districts.

We must likewise point out that under the provisions of section 5 of the Pennsylvania Fair Educational Opportunities Act, the commission is authorized to enforce and administer that act: 24 P. S. 5005. As a result, any school district, and not an unnamed one, can be brought before the commission in order to determine, upon complaint, that educational facilities are being discriminatorily denied to students. Not only is the remedy available to those who are being aggrieved but provision is also made for judicial review to this court. 24 PS §5008. Judicial review is likewise provided in section 10 of the Pennsylvania Human Relations Act: 43 PS §960. The plaintiff cannot come into equity and seek, by indirection, what can be accomplished directly, with due process, through a procedure brought before

the commission. The legislature has specifically provided a complete, full and adequate administrative remedy for the grievances which presently exist within plaintiff's mind and in connection with which the plaintiff imagines injuries might occur. For him to prematurely come into equity seeking similar relief from an illusory malefactor would demonstrate the fallacy of this suit. If the wrongs, which plaintiff anticipates might occur, do occur, they can be redressed in accordance with the remedies provided by the cited acts.

We are likewise at a loss to discover from the pleadings any interest whatsoever which would enable plaintiff to maintain this action. Primarily, he seeks to enjoin the unlawful expenditure of public funds and, indirectly, seeks through an economically-based cause of action, the prohibition of certain allegedly discriminatory practices.

However, any plaintiff in equity, seeking to enjoin the alleged unlawful expenditure of funds, must have the requisite qualifications to bring the action. This very court held in Ladd v. Reynolds, 2 D. & C. 2d 78, 67 Dauph. 111 (1954), that a complaining taxpayer, in a suit in equity seeking injunctive relief, must allege with particularity that he is a taxpayer to the particular funds from which the alleged unlawful expenditure is to be made. See in addition Naugle v. Vaux, Secretary of Health, 68 D. & C. 135 (1949) ; Smith v. Bloom, Secretary, 81 Dauph. 245 (1963). In this present case, plaintiff's complaint does not contain such an allegation. There is not even an averment that his taxes will be increased by this alleged expenditure. Accordingly, for this reason also, the complaint must be dismissed.

Here plaintiff alleges no present unlawful conduct by defendants, but he does allege anticipated misconduct by unnamed parties. It must follow therefore that if plaintiff is to pursue any cause of action, then the court

must have before it the real parties in interest inasmuch as the ultimate remedy is directed toward their allegedly biased behaviors. For this reason, the unnamed parties are not only indispensable and necessary parties, but should be the sole parties hereto.

In Fabiankovitz v. Phoenix Steel Corp., 81 Dauph. 216 (1963), a complaint was dismissed for failure to join a necessary and indispensable party. This court there cited Maxson v. McElhinney, 370 Pa. 622, 625 (1952), for a definition of necessary and indispensable parties as follows:

" '. . . non-joinder is the failure to include, in addition to those named, someone else who has a vital and direct interest in the controversy and whose interest cannot in law or in good conscience be severed from the parties named in the suit. . . .' "

Although the objection of necessary and indispensable parties is the last one considered by us, it is by no means accorded an inferior position, especially since this objection goes to the very jurisdiction of this court to hear the controversey in question. See Gardner v. Allegheny County, 382 Pa. 88 (1955).

Since plaintiff alleges that contracts are to be entered into and enforced in violation of the laws of the Commonwealth, and since performance is sought to be enjoined, it is necessary that all parties to said contract be made parties to this action: Frushon v. Pittston Township School District, 8 D. & C. 2d 165 (1955). Labor organizations are also included as parties under circumstances similar to those in the instant case. See DiSanti v. Corning Glass Works, 9 D. & C. 2d 611 (1956).

Here we can only find that the presence of the unnamed parties is not only required, but their absence is fatally defective to plaintiff's complaint and this is an additional reason why it must be dismissed.

The complaint has also failed to set forth with suffi-

cient clarity in what capacities and under what theories of action it is brought. The named defendants are not so designated in any particular manner nor under any circumstances which could lead them to determine in what capacity they are being sued. The complaint also contains several distinct and independent matters which have been improperly joined in one action, thereby confounding them. The complaint, therefore, has all the earmarks of being multifarious and for this reason likewise must be dismissed: Prudential Loan Society v. Mayer, 25 Dist. R. 885 (1916).

The preliminary objections of the General State Authority raised the same identical questions as those raised in the preliminary objections filed by the other defendants. However, the General State Authority raises two additional reasons why the suit cannot be maintained against it. First, it points out that it is an instrumentality of the Commonwealth of Pennsylvania, and secondly, that being an instrumentality of the Commonwealth of Pennsylvania it is entitled to the sovereign immunity from liability to suit in this particular action. Section 3 of the act creating the General State Authority, specifically designates it as an instrumentality in the following language which is contained in section 3, to wit:

". . . are hereby created a body corporate and politic, constituting a public corporation and governmental instrumentality by the name of 'The General State Authority.' "

In Merner v. Department of Highways, 375 Pa. 609 (1954), there was involved an equity action similar to the case at bar.

The General Rule of Law pertaining to immunity from liability of an instrumentality of the Commonwealth is clearly set forth in 52 Am. Jur. Torts §100. There the following is stated:

"The rule is well settled that the state, unless it has

assumed such liability by constitutional mandate or legislative enactment, is not liable for injuries arising from the negligent or other tortious acts or conduct of any of its officers, agents, or servants committed in the performance of their duties. While there is authority to the contrary, the general rule is that the exemption of the state from liability for torts of its officers and agents does not depend upon the state's immunity from suit without its consent, but rests upon grounds of public policy and the sovereign character of the state. The rule of nonliability of the state for torts of its officers, although often stated in terms indicating it to be a rule of nonliability when the officer is exercising a governmental function, does not appear to be limited to cases where the act of the officer or agent occurred in the discharge of some purely governmental function of the state. *The rule of nonliability of the state for the torts of its officers, agents, and servants applies not only to the state itself, but to those agencies through which the state acts in the administration of the government."* (Italics supplied.)

Without quoting all of the various cases in Pennsylvania which have ruled upon the subject here in question, the Supreme Court has set the question at rest once and for all by the recent decision in Rader v. Pennsylvania Turnpike Commission, 407 Pa. 609 (1962), wherein it clearly held that the Turnpike Commission is immune from liability and that the authority to "sue and be sued," was not intended as a general waiver of the immunity from trespass actions, but applies only to those actions necessary to carry out the business and functions of the commission. The court, on page 614, stated the following:

"Since that time the same contention has been repeatedly presented to the lower Courts of this Commonwealth and each time it has been rejected: Super v. Pennsylvania Turnpike Commission, 19 Pa. D. & C. 2d

372, 73 Dauphin 387 (1959) ; Harrell v. Porter, 19 Pa. D. & C. 2d 385 (1958) ; DiRenzo v. Transamerican Freight Lines, Inc., 10 Pa. D. & C. 2d 723 (1957) ; Caputo v. Pennsylvania Turnpike Commission, 103 P.L.J. 486 (1955) ; Malpica v. Pennsylvania Turnpike Commission, 65 Dauphin 302 (1953). Moreover, since the House case (supra) [House v. Pennsylvania Turnpike Commission, 45 D. & C. 677] was decided in 1942, the legislature has passed seven acts relating to new or additional extensions of the turnpike and each contained the identical 'sue and be sued' clause. Significantly, however, the legislature has not seen fit to vary or amplify this clause in any of the above enumerated acts or to impose upon the Turnpike Commission liability for torts. If the statutory construction and the result reached in House and unanimously followed in the later cases had not been in accordance with the intent of the legislature, it could easily have changed the language of the new Acts to impose trespass liability. Cf. Loeb Estate, 400 Pa. 368, 375-376, 162 A. 2d 207; Cali v. Philadelphia, 406 Pa. 290, 310-311, 177 A. 2d 824. In the light of these facts and the well-reasoned decisions above cited, we do not feel that this legislatively approved result should be judicially changed or modified."

In view of our detailed discussion in this opinion we now enter the following

## Order

And now, to wit, March 24, 1964, the preliminary objections of all of defendants herein are hereby sustained, including those of the General State Authority, judgment is hereby entered in favor of all of the said defendants and against plaintiff in this proceeding and the complaint filed against all defendants herein is hereby dismissed.

## Drejko Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

BURKE, J., May 28, 1964.—The decedent, Stanislaw Drejko, also known as Stanley Drejko, who died a resident of Philadelphia County on November 4, 1961, was joint owner with one, Mary Drozd, of savings account no. 13-24093 of The First Pennsylvania Banking and Trust Company. This account was established on August 24, 1961, and at the time of decedent's death there was a balance on deposit of $7,869.28. Contemporaneously with opening the account, decedent and Mary Drozd executed the following agreement:

"Each of the undersigned is the owner of the whole of the account and each shall have full power to draw against it, and in case of the death of either or any of the undersigned such power shall continue in the sur-

vivor or survivors as fully as if this amount had been originally in the name of such survivor or survivors. It is understood and agreed that either/or any of the undersigned or The First Pennsylvania Banking and Trust Company is hereby authorized to endorse and to deposit in this account any check or other instrument for the payment of money which may be drawn or endorsed to the order of the undersigned or any of them, jointly, or to the order of either or any of the undersigned, individually. This agreement shall bind our respective heirs, executors, administrators or assigns."

On October 19, 1962, Janina Drejko, to whom decedent gave the residue of his estate, filed a petition for a citation to Mary Drozd to show cause why the balance on deposit in the joint savings account should not be paid over to the personal representative of decedent's estate for distribution in accordance with his will. She averred that the sole purpose of the joint account was to enable Mary Drozd, as decedent's agent, to make deposits and withdrawals, and that decedent never intended to vest in her any ownership interest in the balance on deposit.

Mary Drozd denies this averment in her answer and averred contra that the joint account was opened in furtherance of decedent's desire to make a gift to her inter vivos of the balance on deposit.

By decree dated May 17, 1963, Klein, P. J., the petition and answer thereto were referred to the auditing judge for hearing and determination.

It is admitted that the money on deposit in the joint account was originally the property of decedent. In fact, it was the same money which had been on deposit in savings account no. 13-23805 of The First Pennsylvania Banking and Trust Company in the joint names of decedent and Walter Chojnowski subject to a similar agreement until Chojnowski's death on August 12,

1961. Walter Chojnowski was the brother of Mary Drozd.

To constitute a valid gift inter vivos, two essential elements are requisite: An intention to make an immediate gift and such an actual or constructive delivery to the donee (a) as to divest the donor of all dominion and control, or (b) if a joint tenancy is created, as to invest in the donee so much dominion and control of the subject matter of the gift as is consonant with a joint ownership or interest therein: Martella Estate, 390 Pa. 255 (1957). Since manual delivery of a bank deposit is impracticable, delivery must be by assignment or by other writing to execute the gift. The obligation of the bank is a chose in action, and a survivorship agreement signed by both parties is an assignment which vests in them a present joint interest with the right of survivorship in the bank's obligation: Mader v. Stempler, 319 Pa. 374 (1935). A writing in which it is agreed that each is the joint owner of a bank deposit, that either may withdraw, and that upon the death of either, the survivor is the sole owner, is a gift inter vivos, because the opening of the account enabling the donee to forthwith withdraw the fund constitutes delivery: Chadrow, Exr. v. Kellman, 378 Pa. 237 (1954).

Mary Drozd testified that on August 24, 1961, shortly after her brother's death, she visited decedent in response to a message that he wanted to see her; that he told her he wanted her to have the money on deposit in his savings account; that she accompanied him to the bank, told the bank clerk what decedent wanted to do, and after decedent had stated to the clerk that he wanted to change the account so that any balance on his death would pass to her, she and the decedent executed the survivorship agreement.

All of the witnesses agreed that although decedent could not speak or read English fluently, he did under-

stand what he read and what was said to him in English. The bank receptionist, Mary Ann O'Donnell, testified that she interviewed decedent when he opened the joint account in 1961, and that although she did not recall any of their conversation at the time, she stated that in all such transactions she is required by bank instructions to explain to joint depositors that upon the death of either the entire balance on deposit passes by virtue of their written agreement to the survivor. She was quite sure that she made no exception in this case.

*Stanhope S. Browne*, of *Dechert, Price & Rhoads*, for Janina Drejko, residuary legatee, petitioner.

*Harry P. Voldow*, for Mary Drozd, respondent.

*John Kennedy Ewing, 3rd*, of *Saul, Ewing, Remick & Saul*, for The First Pennsylvania Banking and Trust Company, respondent.

*Howard M. Kuehner*, for Jean Chojnowska Arleth, executrix, respondent.