Watson, Appellant, *v.* Witkin et al.

Argued September 23, 1941. Before Schaffer, C. J., Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Marshall H. Morgan, David J. Smyth* and *John W. Kephart,* for appellant.

*Richardson Dilworth,* with him *Maurice Stern,* for Controller and County Executive Committee of Democratic Party, intervening defendant and appellee.

*Harry Shapiro,* for Treasurer, appellee.

*Lewis M. Stevens,* with him *Daniel Mungall, Jr.,* for County Commissioners, appellees.

*William T. Connor,* County Solicitor, for County of Philadelphia and County Election Board, appellees.

OPINION BY MR. JUSTICE MAXEY, September 29, 1941:
Robert E. Lamberton, the duly elected Mayor of Philadelphia for a four-year term beginning Monday, January 1st, 1940, died August 22, 1941, 18 days before the Fall primaries. In obedience to the prescriptions of the Act of March 7, 1939, P. L. 7 (53 P. S. 2925), the vacancy caused by Mayor Lamberton's death has been filled by the President of the Philadelphia Council (Bernard Samuel) acting as Mayor "until the vacancy is filled." The question is: Can the vacancy arising from Mayor Lamberton's death be filled at the Municipal election to be held on November 4, 1941? The court below was asked in a taxpayer's bill to enjoin the County Commissioners from holding a Mayoralty election this November. The court refused to do so, deciding that an election for Mayor can legally be held on the ensuing 4th of November. This appeal followed.

It is conceded by all that under the provisions of the primary election law, no candidate for Mayor could have been nominated in the September 9th primaries. Under the Election Code of June 3, 1937, P. L. 1333, 25 P. S. 2601 (hereinafter referred to as "the Code"), certain legal steps must be taken by proper public officials for

4

the nomination each year of candidates for offices to be filled at the ensuing November election, as early as "on or before the tenth Tuesday preceding the Fall primary". Section 904 of Article 9 of the Code (25 P. S. 2864) provides that: "To assist the respective county boards in ascertaining the offices to be filled, it shall be the duty of the clerks or secretaries of the various cities, boroughs, towns, townships, school districts and poor districts, with the advice of their respective solicitors, on or before the tenth Tuesday preceding the Fall primary, to send to the county boards of their respective counties a written notice setting forth all city, borough, town, township, school district and poor district offices to be filled in their respective subdivisions at the ensuing municipal election, and for which candidates are to be nominated at the ensuing primary. . .". Section 905 of Article 9 of the Code (25 P. S. 2865) provides: "On or before the tenth Tuesday preceding each primary, the Secretary of the Commonwealth shall send to the county board of each county a written notice designating all the offices for which candidates are to be nominated therein, or in any district of which such county forms a part, or in the State at large, at the ensuing primary, and for the nomination to which candidates are required to file nomination petitions in the office of the Secretary of the Commonwealth, . . ."

Section 906 of Article 9, June 3, 1937, P. L. 1333 (25 P. S. 2866) provides that "Beginning not earlier than nine nor later than eight weeks before any regular Spring or Fall primary, the county board of each county shall publish in newspapers ["at least two newspapers of general circulation, one representing the majority party and one representing the minority party, if there be that many published within the limits of such county or municipal subdivision" (25 P. S. 2606)] . . . "a notice setting forth the names of all public offices for which nominations are to be made. . . . Said notice shall contain the date of the primary, and shall be published once each week for two successive weeks."

Section 907 of Article 9 of the Election Code (25 P. S. 2867) provides that "the names of candidates . . . for party nominations . . . shall be printed upon the official primary ballots . . . of a designated party, upon the filing of separate nomination petitions in their behalf, in form prescribed by the Secretary of the Commonwealth, signed by duly registered and enrolled members of such party who are qualified electors . . . of the political district . . . within which the nomination is to be made or election is to be held. The name of no candidate shall be placed upon the official ballots to be used at any primary, unless such petition shall have been filed in their behalf." Subdivision d of Section 913 of Article 9 of the Election Code (25 P. S. 2873) provides that "all nomination petitions shall be filed at least fifty days prior to the primary." These and other provisions of the Code prove the impossibility of placing on the ballot or on the voting machine used in the November 4th election in Philadelphia *any nominee for the office of Mayor.* Yet despite this fact appellees contend that a Mayor must be chosen at the forthcoming municipal election on the date named.

Section 4a of Article 2 of the Charter Act of Philadelphia (Act of June 25, 1919, P. L. 581) reads as follows: "When a vacancy shall take place in the office of mayor, a successor shall be elected for the unexpired term at the next election occurring more than thirty days after the commencement of such vacancy, unless such election should occur in the last year of said term, in which case a mayor shall be chosen by the council by a majority vote of all the members elected thereto".

If we construe that section *literally* it means that a Mayor of Philadelphia must be elected on November 4th next. If "next election" means *that* next election held at a date so far ahead of the date the vacancy arose as to give the entire electoral machinery prescribed by law, including the machinery of "primary" elections, whose due functioning the law declares *shall* be a preliminary to the "final" elections, time to function, then the elec-

tion of a Mayor can*not* be held on November 4th next. The problem thus becomes one of interpreting Section 4 of Article 2 of the Philadelphia Charter Act of 1919.

The Statutory Construction Act of May 28, 1937, P. L. 1019 (46 P. S. 551), declares (section 51) : "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature". Section 52 declares that "in ascertaining the intention of the legislature in the enactment of a law, the courts may be guided by the following presumption: (1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable".

This rule is only a statutory expression of a precept that has immemorially guided the appellate courts of this state and nation and all other courts, in construing statutes. This court said in 1880 in *Big Black Creek Improvement Company v. The Commonwealth,* 94 Pa. 450 : "Statutes are to be construed so as may best effectuate the intention of the makers . . . though that construction may seem contrary to the letter of the statute". We reiterated that in *Com. v. Provident Trust Co.,* 287 Pa. 251. In *Chew Heong v. United States,* 112 U. S. 536, 555, the United States Supreme Court said : "General terms should be so limited in their application as not to lead to . . . an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter". In *United States v. Kirby,* 7 Wall 482, 486, Justice Field speaking for the United States Supreme Court, in refusing to interpret an act of Congress *literally,* said : "All laws should receive a sensible construction. The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the

statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—'for he is not to be hanged because he would not stay to be burnt.' " In *Bell v. New York*, 105 N. Y. 139, the New York Court of Appeals declared "the exact and literal wording of an Act may sometimes be rejected, if, upon a survey of the whole Act and the purpose to be accomplished, or the wrong to be remedied, it is plain that such exact or literal rendering of the words would not carry out the legislative intent." See also Endlich on the "Interpretation of Statutes", section 295.

During the early years of this Commonwealth elections to public offices, especially to municipal offices, were conducted in a "town meeting" manner without much formality. When the party system became a part of American political life, each party chose its own method of nominating candidates for even the highest offices in the nation and in the state. Under section 30 of the Act of February 2, 1854, P. L. 21, being "An Act to incorporate the City of Philadelphia", it was provided that "the tickets to be voted at the municipal elections shall be on separate pieces of paper, on which shall be written or printed the names of the office to be filled, and immediately under the name of the office, the name or names of the person or persons voted for to fill such office." Apparently the tickets so voted were provided by the voter himself or were furnished him by a party organization.

By the Act of March 30, 1866, P. L. 92, voters were required to vote at all elections "by tickets, printed or written, or partly printed and partly written, severally classified as follows: one ticket was for judicial candidates only, one ticket was for state candidates only, one ticket was for 'all county officers voted for, including office of senator, members of assembly, members of Congress' and the other tickets were respectively for township and borough offices." "Each class" had to be "deposited in separate ballot-boxes".

Before the Act of June 19, 1891, P. L. 349, providing for the printing of official ballots to be used at November elections, and providing also for the certification to the proper public officials of the persons nominated for public office by conventions of delegates or caucuses held under the rule of a political party, or any board authorized to certify nominations representing a political party, the Commonwealth had little or no concern with nominations to public office. Even the Act of 1891 just referred to only "regulated" in slight degree nominations to public office. Its chief concern with nominations was to safeguard the official ballot provided for in the Act so that persons with no proper claim to a nomination should not have their names thereon. Under that act candidates for public office could be chosen by committees of delegates or by a caucus held under the rules of a political party and the nomination for State offices could be certified by an authorized party board to the Secretary of the Commonwealth and the nomination for other offices could be certified to the commissioners of the proper county. The act also provided for nominations to be made by nomination papers. For offices other than state offices and other than borough and township offices certificates of nomination could be filed with the county commissioners 42 days before, and nomination papers for such offices could be filed 35 days before, election day. For township and borough offices nomination papers could be filed with the auditors seven days before election day. Under the simple procedure thus prevailing before the Uniform Primary Act was adopted when vacancies in city or county offices arose even as late as five weeks before the November election, timely nominations to fill those vacancies at that election could be made.

Under the Act of 1891, if any candidate died or withdrew, the party organization by means of an authorized committee, or the citizens who nominated such candidate by nomination papers could nominate a substitute by filing in the proper office, *at any time before the day of*

*election,* a nominating certificate or paper conforming to certain requirements. If a substituted nomination was made after the ballots were printed, the commissioners or auditors were directed (section 12) to "prepare to distribute with the ballots suitable slips of paper, bearing the substituted name together with the title of the office and having adhesive paste upon the reverse side which shall be offered to each voter with the regular ballot and may be affixed thereto".

The Uniform Primary Law has completely integrated nominations for public office with the election which takes place in November following such nominations. Under the Code the electoral machinery to choose public officials at any November election must begin to function at least "ten Tuesdays" before the date of the Fall primary. Section 604, article 6 of the Code, (25 P. S. 2754), provides that "candidates for all offices to be filled at the ensuing municipal election shall be nominated at the Fall primary". There is a similar provision in Section 902, article 9 of the Code (25 P. S. 2862), which adds that candidates "shall be elected in no other manner."

In the face of this law appellees contended, and the court below upheld their contention, that party nominations can be made by the political parties in some manner "in accordance with their rules and regulations". The court below said: "We conclude that the nomination of candidates for the office of mayor to be filled at the forthcoming Municipal election should be left to the political parties to be selected in accordance with their rules and regulations and that certificates of nomination from the political parties be accepted by the County Board of Elections and used in preparing the official election ballots".

This is plain error, for under the Code the political parties of the city of Philadelphia or their committees have no more authority to select candidates for the office of Mayor of that city, *under the contingency arising from*

*Mayor Lamberton's death,* than they would have to select candidates for Mayor of Pittsburgh. An attempt on their part to select such candidates for Mayor to be voted for at this November's election is usurpation.

Article 9, section 979 of the Election Code of 1937 (25 P. S. 2939), provides as follows: "Any vacancy happening or existing after the date of the primaries in any party nomination, by reason of the death or withdrawal of any candidate, may be filled by a substituted nomination made by such committee as is authorized by the rules of the party to make nominations in the event of vacancies on the party ticket." Nothing can be clearer than the fact that under this provision an authorized party committee can make a substituted nomination only if a vacancy happens *after* the date of the primaries. The vacancy giving rise to this case happened twenty two days *before* the primaries and was *not* "in any party nomination". The authorized party committee can make *substituted* nominations *only when the duly nominated candidate of the party dies or withdraws as a candidate.* Before there can be a *"substituted* nomination" there must have been a nomination.

The court below in its opinion admits that "the legislature has set up no specific machinery . . . for holding of such an election" (i. e. for Mayor in November next). The court then says: "The rules of the political parties are not before us, and it may not be feasible for a political party to nominate its candidate for the office of Mayor. In any event the Board of Elections will prepare official election ballots, which shall be in accordance with the Election Code of 1937 generally, and specifically as in the case no candidates have been nominated for an office (see section 1003e). This will give the voter an opportunity to exercise the right of suffrage by writing in the name of his candidate or using what is commonly called a sticker. *DeWalt v. Bartley,* 146 Pa. 529, 24 A. 185." The "sticker" referred to is a "printed adhesive strip" which was authorized (as already noted in

this opinion) by the Act of June 19, 1891, P. L. 349, but that Act was "repealed absolutely" by the Election Code of 1937, as it is so declared on page 1509 of the Pamphlet Laws of 1937.

What the court below thus directed the Board of Elections to do "specifically" is something the Board of Elections has no legal authority to do and is something which the court below is without power to direct, for courts have no legislative power and what the court below directed is legislative in character. Section 1003e of the Election Code (25 P. S. 2963) cited by the court below is here quoted in its entirety, as follows: "There shall be left at the end of the group of candidates for President and Vice-President of the United States under the title 'Presidential Electors', as many blank spaces as there are presidential electors to be elected, in which spaces the elector may insert the names of any individual candidates for presidential electors for whom he desires to vote. There shall also be left at the end of each group of candidates for each other office (or under the title of the office itself in case no candidates have been nominated therefor), as many blank spaces as there are persons to be voted for for such office, in which space the elector may insert the name of any person or persons whose name is not printed on the ballot as a candidate for such office." One will perceive by attentiveness to this provision that "blank spaces" on official ballots "in which space the elector may insert the name of any person or persons whose name is not printed on the ballot as a candidate for such office", that is, for the office to be filled at that election *can be* "left at the end of each group of candidates for each other office" (i. e. for offices other "than the office of President and Vice-President of the United States") or under the title of the office itself in case no candidates have been nominated therefor, *only* when by the commanded *ascertainment, certification* and *advertising* (already herein referred to) nominations of candidates for certain offices are to be made in the pri-

maries which are the preliminary to the ensuing November election. Until this "ascertainment", "certification" and "advertising" are done the Board of Elections has no authority whatsoever to print on the ballot the title of *any* public office as an office to be filled by a choice made in the ensuing election and then leave blank spaces after the title of that office as an invitation to the voters to "write in" the names of their choice for such office. If such blank spaces should be provided on the ballot without the required previous "ascertainment", "certification" and "advertising" of the office to be filled, the acts of the voters in writing in names would be utterly without legal effect.

The phrase "in case no candidates have been nominated therefor", which phrase is found in the parenthetical clause in section 1003e, gives no support (except when superficially considered) to the position taken by the court below. Its obvious meaning is that when parties have had *an opportunity* to nominate candidates for public office in the primaries to which the Election Code (of which section 1003e is a part) so largely relates and have failed to do so, *then in that contingency* the voters may in blank spaces left at the end of each group of candidates or under the title of the office in case no candidates have been nominated therefor (as the case may be) insert the name of any person or persons whose name is not printed on the ballot as a candidate for such office. This contingency seldom if ever arises in a great city like Philadelphia, though it may possibly arise in some small communities. This contingency has *not* arisen in the City of Philadelphia for the voters of the respective parties had no opportunity, as is freely conceded, to nominate any candidate for Mayor at the September 9th primaries.

To hold that under the conditions existing by reason of Mayor Lamberton's death, an election for Mayor of Philadelphia can be conducted by giving the voters the opportunity to write in the names of their respective

candidates for this office is to give section 4a of Article 2 of the Charter Act a construction which would lead to a result that is absurd, and this is something which the legislature by the Statutory Construction Act of 1937 says courts should not do.

There are in the City of Philadelphia 1,014,128 registered voters. To hold that this army of voters can by each individual thereof merely writing in the names of his or her choice, select a Mayor by such a plurality or majority as will fairly express the public will is a manifest absurdity. This court held in *Derringe v. Donovan et al.*, 308 Pa. 469, 476, that to "invest with an important public trust a person who might be voted for by only a comparatively inconsequential number of voters would not facilitate the recognition of the popular will but would make possible its nullification". Furthermore, in a city as large as Philadelphia with the great duplication in names of residents, how would it be possible to determine *for whom* an elector voted if the person whose name he "wrote in" might mean one of two or of two hundred persons. For example, the city directory of Philadelphia discloses the fact that in that city there are 326 "William Smiths", 239 "John Smiths", 242 "William Browns", 145 "Harry Cohens", 107 "James Gallaghers", 167 "John Kellys", 127 "William Wilsons", 124 "John Murphys", 136 "William Jacksons", 160 "William Millers", 132 "John Williams" to say nothing of the "John Browns" and the "John Thomases" and the "John Joneses" and hundreds of other names which are duplicated to multiple degrees.

No principle can be invoked to justify any court in so construing an act of legislation as to lead to such confusion and chaos as would result if we should decree that the third largest city of the United States must elect its Mayor by the haphazard and disorderly method of having its million voters "write in" the name of their respective choices for that important office. It is probable that only a small minority of the voters would take

the pains to vote for any person for Mayor and to properly identify that person by his address. It might easily happen that an utterly incompetent individual who received a vote which would represent only a small per cent of the city's electorate would receive a plurality of the "write in" vote for Mayor and so be elected. Even counsel for the appellees say in their paper book: "It would be an unfortunate result if the mayor had to be elected by such undirected and chaotic voting to which this [i. e. voting by "writing in" names] might lead because of the absence of the names of any nominated candidates of political parties on the ballot". Since there is *absolutely no warrant in law* for making a substituted nomination by political committees where *no original nomination* has been made, (as an inspection of the Code clearly reveals to either a professional or lay mind) and since it is conceded by all that to elect a Mayor by means of "write ins" would be "chaotic" and "unfortunate", our duty is so to interpret the statute as to prevent this. As Judge CARDOZO said in *In re Rouss,* 221 N. Y. 81, 116 N. E. 782: "Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be so construed, if possible, that absurdity and mischief may be avoided."

Appellees contend that "it is contrary to the principles of representative, democratic government" that one who succeeds to office as did the President of Council "should remain in office for such a length of time [two years and four months] without standing for election". This is an argument which should be addressed to the legislature and not to the courts, for the duty of courts is to interpret laws, not to make them. However, we cannot agree that to permit individuals who have not been elected to a high office to succeed to that office on the death of the office's elected incumbent, is contrary to the genius of American institutions. Within the past decade, the cities of New York and Chicago had as their respective Mayors for substantial periods men who had

not been elected to that office by the city electorate but who succeeded to the office by virtue of a statute, when the office became vacant by reason of the Mayor's resignation, in the New York case, and the Mayor's death, in the Chicago case. For the second time within a few years, the Mayor of Philadelphia died and the President of Council succeeded to the office for a substantial period. If Mayor Lamberton had died seventy five days later, no one could question the fact that the President of Council would succeed him and remain in office until the first Monday of January 1944. We think this is conceded in appellees' brief of argument, to which we will later make further reference.

Six incumbents of the great office of President of the United States have died in office and six incumbents of the Vice-Presidency have died in office. If John Tyler, who on April 4, 1841 succeeded President William Henry Harrison, had died in office a short time after *he* became President (as Harrison did) his successor as President would have been the then President pro tem of the United States Senate, Samuel L. Southard, and he would have served as President nearly four years. If one more adverse vote had been cast against Andrew Johnson on May 26, 1868, in the impeachment proceedings in the United States Senate, the then President pro tem of the Senate, Ben Wade, would have become President. If President McKinley had died between the date of Vice-President Hobart's death, November 21, 1899, and the close of his first administration, on March 4, 1901, the then Secretary of State,* John Hay, would have become President. If President Coolidge had died in his first

---

* After the death of Vice-President Hendricks on November 25, 1885, the law as to presidential succession was changed by the Presidential Succession Act of January 19, 1886. The Secretary of State is first in the order of succession and the Secretary of the Interior is the last. The Secretaries of Agriculture, Commerce and Labor are not included in the succession as those departments were not in existence in 1886.

16

term, the then Secretary of State, Charles Evans Hughes, would have become President. Since public officials, like all other men, are mortal the orderly processes of government require that statutory provision be made for the immediate succession of Mayors and other important public servants. In the Act of March 7, 1939 (supra), the State through its legislature declared that the President of the City Council of Philadelphia was the proper official to succeed to the powers and responsibilities of the Chief Magistracy of Philadelphia. It follows that he must remain in that office until his elected successor can be chosen in the manner the law provides.

We deem it proper to declare at this time that the next election for the office of Mayor of Philadelphia cannot be held until the Municipal Election on the first Tuesday following the first Monday of November, 1943 (November 2, 1943). Appellees, while contending that a Mayor should be elected on November 4th, *this* year, do not contend that if a Mayor is not elected this year, one can be elected in *1942*. In their argument they say: "the contention of appellant [in the instant case] would freeze in office for two and a half years a man [Bernard Samuel] who has never appeared before all the electors of the city," etc. The court below in its opinion found that "there are no statutory provisions for the holding of a special election to fill said vacancy [in the office of Mayor]".

This finding is in accord with the Constitution of Pennsylvania and the applicable statutes. Article 2, section 2, clause (a) of the Philadelphia City Charter (Act of June 25, 1919, P. L. 581, 53 P. S. 2922) provides: "The Mayor shall be chosen at the municipal election, and shall hold office for the term of four years". Section 4, clause (a) of the Charter Act, quoted in the earlier part of this opinion, refers to "the next election occurring more than thirty days after the commencement of a vacancy in the office of Mayor" as the time for electing "a successor for the unexpired term". We have demon-

strated that *this* "next election" cannot be the Municipal Election to be held on November 4th of *this* year. Compare this with *Buckley v. Holmes,* 259 Pa. 176. Since a Mayor under the charter must be chosen at a *Municipal* Election, and not at a *General* election, it follows that a Mayor of Philadelphia cannot be elected until the next Municipal Election *after* the 1941 Municipal Election, unless there is some statutory provision for a special election for Mayor to be held at the time of the General Election in 1942. There is no such provision in the Election Code of 1937 or elsewhere. This Code provides for special elections to fill vacancies in the following offices only: (1) United States Senator, (2) Representative in Congress, (3) Member of the General Assembly. Special elections are also provided for "on a proposed constitutional amendment or other question, to be voted on by the electors of the state at large, or by the electors of any political district". (See 25 P. S. 2787 and 3069).

The failure of the legislature to make any provision for special elections to fill the office of Mayor of Philadelphia is of legal significance. "It is a general principle of interpretation that the mention of one thing implies the exclusion of another thing; expressio unius est exclusio alterius. The affirmative description of the cases in which the jurisdiction may be exercised implies a negative on the exercise of such power in other cases." 25 R. C. L. 981, section 229, citing, inter alia, *Page v. Allen,* 58 Pa. 338, 346; *Walla Walla v. Walla Walla Water Co.,* 172 U. S. 1, 19 S. Ct. 77, 43 U. S. (L. ed.) 341.

Article 8, Section 3 of the State Constitution, as amended in 1913, provides that "All elections for judges of the courts for the several judicial districts, and for county, city, ward, borough, and township officers, for regular terms of service, shall be held on the municipal election day; namely, the Tuesday next following the first Monday of November in each odd-numbered year, but the General Assembly may by law fix a different day, two-thirds of all the members of each House consenting

thereto: PROVIDED, That such elections shall be held in an odd-numbered year:". Article 12, Section 1 of the State Constitution as amended in 1909, provides that "All officers, whose selection is not provided for in this Constitution, shall be elected or appointed as may be directed by law: Provided, That elections of State officers shall be held on a general election day, and elections of local officers shall be held on a municipal election day, except when, in either case, special elections may be required to fill unexpired terms." There is no such statutory requirement in respect to the office of Mayor of Philadelphia.

The people of this Commonwealth speaking through their organic law have thus unequivocally declared that elections for local offices shall be held on Municipal election days in *odd*-numbered years. The public policy served by holding elections for local offices in years other than those when elections are held for state and national offices is obvious, for local electoral issues have no relation to state and national issues.

The Election Code of 1937 (supra) expressly purported to "codify, revise and consolidate the laws relating to general, municipal, special and primary elections". The fact that in that comprehensive code covering 205 pages of the Pamphlet Laws of 1937 and in which 40 pages are devoted to the repeal of former election acts beginning with the Act of August 24, 1717, (Vol. 111, Statutes at Large, p. 138) and including election laws passed as recently as 1935, no provision was made for special elections on *general* election *days* or on general election *years* or at any other time, to fill vacancies in the office of Mayor of Philadelphia, leaves no room for doubt that the legislature intended that the above cited explicit provisions for electing a Mayor only at municipal elections in odd-numbered years should stand. The Code, Article 6, Section 602 (25 P. S. 2752), explicitly provides that "all county, city, borough and township officers shall be elected in the municipal election".

The decree of the court below is reversed. The defendants, Morton Witkin, James C. Clark and John J. Hennessey, County Commissioners of Philadelphia, Constituting the County Board of Elections of Philadelphia, are enjoined from arranging and preparing for, and causing to be conducted or held, an election for the office of Mayor in the City of Philadelphia, at the Municipal election to be held on November 4, 1941, and from permitting the nomination of candidates for the said election. The defendant, the County of Philadelphia, is enjoined from expending or causing to be expended, any public funds required for the holding of the said election and nominating of candidates therefor. The defendant, Robert C. White, Controller of the City and County of Philadelphia, is enjoined from approving any expenditure of any moneys by the County of Philadelphia, incurred or to be incurred for the holding of the said election and the nominating of candidates therefor.

Costs to be paid by the County of Philadelphia.