James Estate

2

4

. . ."

6

12

14

18

20

21

24

*Lois G. Forer*, Deputy Attorney General, for exceptions.

*William C. Hamilton*, for *Fell & Spalding*, contra.

*W. LeRoy McKinley*, of *McKinley & Anthony*, for the Masonic Homes at Elizabethtown, Pa.

## OPINION SUR EXCEPTIONS

SHOYER, J., June 21, 1963.—Three members of this court are firmly convinced that the General Assembly has removed from judicial determination every vestige of our former power to declare a charitable accumulation void on the ground that it is unreasonable as to either duration or amount. By section 6(a)(1) of the Estates Act of 1947, as amended on February 17, 1956, P. L. (1955) 1073, sec. 3, the legislature has stated its views on this branch of the law and has preempted the field. This is subject, of course, to our inherent power to grant judicial relief against a proven "result that is absurd, not merely unreasonable" * : Statutory Con-

---

* This is a slight paraphrase of the actual language of the statute which reads:

"Section 52. Presumptions in Ascertaining Legislative Intent.— In ascertaining the intention of the Legislature in the enactment

struction Act of May 28, 1937, P. L. 1019, sec. 52(1), 46 PS §552(1) ; Watson v. Witkin, 343 Pa. 1, 6; Commonwealth v. Darcy, 362 Pa. 259, 272; Commonwealth ex rel. Scull v. Grant, 2 Woodw. Rep. 379, 384. The essence of the evil of any accumulation is its unreasonableness, which legislative sanction now declares to be no evil at all "in a trust for any charitable purpose". We are aware of the correlation between the adjectives, "absurd" and "unreasonable", but we also recognize the difference in degree as logically expressed in the phrase *reductio ad absurdum.* See Homestead Borough v. Defense Plant Corporation, 356 Pa. 500, 508. That the instant record discloses no present absurdity in the prospective growth of this prescribed accumulation does not close the door to proof of such fact (if it should become a fact) in the future. This construction we believe to be consistent with our judicial duty to interpret, not to legislate.

We believe that the learned auditing judge in his readjudication has fully answered and completely refuted every argument advanced by the Masonic Homes at Elizabethtown, Pa., the charity here involved, or by the Commonwealth. It should be noted that the charity is no longer an exceptant, for the reason stated by its counsel, Mr. McKinley, that the charity has fully explained its position on previous occasions both to the auditing judge and to this court en banc, and, commendably, does not wish to be considered a litigant in the bitter-end sense of the word.

Very little need be added to what Judge Saylor has so persuasively said. His readjudication, under its headings of Pennsylvania Statutory Law and Section 1, refers to the correlation between the rule against perpetuities and the rule against accumulations as ex-

---

of a law, the courts may be guided by the following presumptions among others:

"(1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable; . . ."

pressed by the legislature in sections 4 and 6 of the Estates Act. In amending section 6 to conform to the phraseology of section 4, the legislature reversed the emphasis of the Commonwealth's public policy and made validity of accumulations the rule, invalidity the exception. If the sacrifice of substance to form was done unwittingly, such error can be corrected easily and readily by legislative amendment. The statutes of other States, for example, New York, provide that the ultimate decision as to the "reasonableness, amount and duration" of the charitable accumulation rests with the court. Such a provision seems clear enough, and if enacted as an addendum to the Pennsylvania statute, would undoubtedly empower this court to decide what is reasonable, or not, in future cases. We suggest that the Commonwealth, as parens patriae, might well urge such amendment upon the legislature before some other testator, encouraged by the present statutory language, directs an even more extreme accumulation than exists in the present will.

Since three members of this court would dismiss the exceptions of the Commonwealth for the above reasons, as well as those stated by the learned auditing judge, the exceptions are dismissed and the readjudication is confirmed absolutely.

OPINION CONCURRING IN PART
AND DISSENTING IN PART

KLEIN, P. J. and BOLGER, J., June 21, 1963.—The division in the court arises because the auditing judge and those of our colleagues who agree with him appear to have concluded that section 6 (b) (1) of the Estates Act of 1947, as amended 1956, P. L. (1955) 1073, 20 PS §301.6 (b) (1), must be interpreted strictly and literally regardless of how unreasonable the direction to accumulate income may be. Such a construction could easily lead to an absurd result, which the legislature obviously did not intend as, for example, a direction to

accumulate the income on a trust principal of $10,000 for a period of 10,000 years.

This section of the Estates Act was enacted primarily to harmonize the law respecting accumulations of income in private trusts to conform to the changes in the rule against perpetuities respecting disposition of principal made in the statute. Subsection (1) in extraordinarily terse terms appears to authorize the accumulation of all or unlimited sums of income accruing from any amount of principal for an unlimited period or periods of time. Clearly, the draftsman of this section paid insufficient attention to the gravity and importance of the vastly expanding subject of charitable trusts.

Charitable trusts are favorites of the law because they are in relief of the public burden. The principal of such gifts is exempt from the imposition of State inheritance and Federal succession and gift taxes, and from current State and local, including school, personal property and real estate taxes, as well as generally from Federal income taxes. Obviously, the purpose of these exemptions is to encourage charitable gifts, whether direct or in trust. These benefactions have risen on a national scale to more than eight billions of dollars in principal annually. Clearly, these enormous private contributions to the national welfare and the income derived from those given in trust must, in many areas, result materially in the reduction of what would otherwise be the public or governmental responsibility in these enlightened times of almost universal social consciousness. Such benefactions in the past have awakened and still quicken and give direction to governmental appropriations in this area. It follows necessarily from this legislative favoritism that the legislative intent inherent therein is that the benefits flowing from such gifts in trust should directly, currently and reasonably perform their function and not

be unduly postponed. Therefore, it is the duty of this court, in furtherance of its visitorial powers over charitable trusts, to implement this intent. The adjudication and the majority opinion overlook this basic aspect of the case.

The following definition is found in section 1 of the Estates Act: "(1) 'Charity' or 'charitable purposes' includes but is not limited to the relief of poverty, the advancement of education, the advancement of religion, the promotion of health, governmental or municipal purposes, and other purposes the accomplishment of which is beneficial to the community." This is substantially the same definition as is found in Restatement of Trusts §308. See also Hunter's Pennsylvania Orphans' Court Commonplace Book, vol. 1, 2d ed., p. 176, "Charities" 1(a). Any attempted benefaction which does not meet this test is void. It is with this background that we must view the legislative intent as expressed in this act.

The principal of charitable trusts may be held for any period of time, even in perpetuity. A literal reading of this statute would authorize the perpetual accumulation of *income* as well as of principal. Obviously, this was not the legislative intent. Such gifts would be ineffectual, would achieve no charitable purpose and would consequently be void as charitable gifts, since no direct benefit would ever flow from them; their term would be uncertain: Girard Company v. Russell, 179 Fed. 446. We must imply that the legislative intent was to further charitable purposes and not to void them. It would, therefore, appear that if income cannot be accumulated perpetually, there must be some stage during the operation of a trust short of perpetuity when the accumulation of income shall cease. At what stage of its operation such event shall occur must be a judicial function in the absence of any legislative direction relating thereto.

For these reasons, the act must be held to be ambiguous and not the clear declaration of legislative intent requiring a literal interpretation. Therefore, the act must be liberally construed; such construction should be consistent with the Pennsylvania legislative intent of its tax-exempting statutes and thus brought into line with the law in practically all of the other States of the Union, all of which subscribe to the "reasonableness doctrine" as set forth in Judge Lefever's dissenting opinion.

The will provides that all of the income be accumulated for successive periods of 20 years, and at the end of each such period to distribute one-half to the charity, but for a period of 220 years after death to add the remaining one-half to principal and thereafter for an additional period of 180 years, each 20 years to add one-quarter of income to principal.

In our opinion, the direction to accumulate income for 20 years is not unreasonable and should be upheld as valid. Often the annual distribution of income is of no substantial benefit to a charitable trust, whereas, if it be accumulated for a period of 10 or 20 years, the receipt of the increased sum could be used for necessary capital improvements or other essential needs which have not been met currently because of lack of funds.

We believe, further, that the direction to add one-half of the income to principal for 220 years and thereafter one-quarter of income to principal is unreasonable and should be stricken down and the income so accumulated paid to the designated charitable beneficiary at the expiration of each 20-year period, pursuant to the provisions of section 7 of the Estates Act of 1947, as amended, which provides that "Income subject to a void direction or authorization to accumulate shall be distributed to the person . . . in whom the right to such income has vested by the terms of the instrument or by operation of law".

It is not necessary for the court to await future events to determine whether the accumulation provisions of this trust prove absurd or unreasonable. The inevitability of such result is now apparent.

In summary, we are of the opinion that a reasonable disposition of the troublesome problem confronting us is to direct the accumulation of all the income for 20 successive periods of 20 years, *all* of the accumulated income to be distributed to the designated charitable beneficiary at the expiration of each 20-year period. As there is no prohibition against the direction to keep the principal intact, it should be held for 400 years as testator directed when it would be distributed in accordance with his instructions and the trust terminated.

For these reasons we would modify the readjudication in accordance with this opinion.

### DISSENTING OPINION

LEFEVER, J., June 21, 1963.—The majority decides that ". . . in Pennsylvania there are no limitations on accumulations for charitable purposes, either under the common law or by statute"[1] and ". . . . so far as charitable trusts are concerned there can be no void accumulations. . ."[2] The court concludes that ". . . the General Assembly has removed from judicial determination every vestige of our former power to declare a charitable accumulation void on the ground that it is unreasonable as to either duration or amount".[3]

It follows from this sweeping decision that a trust of only $1, which directs the income to be accumulated for 2,000 years and then the principal and accumulated

---

[1] Page 17 of readjudication of Judge Saylor. This readjudication has been adopted by the court in Judge Shoyer's brief opinion.

[2] Readjudication, page 5.

[3] Majority opinion, page 25.

income to be applied to the use of specified colleges, churches and hospitals would be upheld by this court. Likewise, a similar trust of $100 or $1,000,000,000, the income to be accumulated for 10,000 years, would be sustained. So also, the court would hold valid a trust in any amount, 99 percent of the income to be accumulated perpetually and one percent of the accumulations to be distributed every 500 years for the same charitable purposes.

To sustain the accumulations in these trusts is unthinkable. Yet, the majority states, "if it be contended that there is a social or economic evil in accumulations as such, how can an accumulation of any kind, or in any amount, or for any period of time be countenanced by the court? If an accumulation for four hundred years . . . is a social evil, why should one for forty years, or for only four years, be other than a social evil?" [4] This statement is utterly illogical. By the same reasoning, since one-quarter or one-sixth of a grain of morphine is effective in relieving a patient's acute pain, there is no harm in administering a dose of five or 10 grains to him. It is a truism that while many things may be efficacious in measured quantities, an overdose is apt to be fatal to an individual or society. So with accumulations for charity.

The majority, in reaching its conclusion, apparently is not aware of the fantastic product of geometric progression.[5] Accumulation of income for a period of years

---

[4] Readjudication, page 15.

[5] An ancient chess anecdote illustrates this: "Centuries ago an Indian King ordered his engineer to invent a new game. Chess was born. The King offered to reward his engineer who at first refused, but finally said 'Give me one grain of corn for the first square of the chess board, two for the second, four for the third, and so on, doubling the number of kernels on each of the 64 squares.' The King readily consented. Corn was brought in. By the time the 35th square was reached, all the corn in India was required." Mathematicians

brings the law of geometric progression into operation.

Dr. F. Emerson Andrews, in his penetrating book "Philanthropic Foundations", published by Russell Sage Foundation, New York, 1956, states, at page 92:

"An accumulating fund is one in which none of the principal and not all of the income is spent, at least for a stated period. In early times the theoretical possibilities of accumulation through compound interest attracted many donors. That the more extreme of these hopes involve an economic fallacy can easily be demonstrated:

"Let it be assumed that when Julius Caesar invaded Britain just 2,000 years ago, he placed the equivalent of a single American dollar on interest, to be compounded annually at the rate of 5 per cent. Ten years later, at about the time of his death, it would have amounted to the modest sum of $1.63. In 100 years, 45 A.D., it would have grown to only $131.50. But in 500 years—445 A.D.,—it would have been something more than 39 billion dollars. In 1000 years its value could be expressed only by a figure 22 digits long; today, 2000 years later, the original dollar would theoretically have grown to a worth expressible only in 43 digits.

"It is obvious that if compound interest could be regularly secured on any long term fund it would soon absorb all available investment opportunities, and long before that point was reached society would find some way of limiting or liquidating it."

---

have calculated that at the sixty-fourth square, the total number of kernels of corn would have been 18,446,744,073,709,551,615; and if the corn had been available, it would have covered the earth several inches deep. Mathematically, this is two raised to the sixty-fourth power, minus one. This anecdote and the calculations have appeared in chess publications. The mathematics have been certified by the actuarial department of Penn Mutual Life Insurance Company.

And, at page 95:

". . . The weight of practice and of social thinking is clearly against suspension of present activities in favor of problematical future needs, or the long gambles of compound interest."

Because of the geometric compounding factor in accumulation, each of the above hypothetical trusts would eventually attain mammoth proportions. If allowed to continue to accumulate, free of tax, these trusts would profoundly affect our economy. Nonetheless, the ruling of the majority is to the effect that this court is powerless to prevent the dire economic, social and political consequences of such trusts.

The instant trust is as unreasonable as the hypothetical cases, and the end result, when properly calculated, is only slightly less absurd. The trustee calculated that the trust at its termination in 2360 would amount to approximately $15,000,000. However, this estimate was based upon three percent interest compounded annually. *But at six percent interest compounded annually the fund would exceed $19,000,000,-000;* and a much larger sum, if compounded quarterly. For years, six percent return on investments was the rule. At times it has been higher. Six percent is the legal rate of interest in Pennsylvania today. Presently, the usual trust earns approximately four percent income annually. The readjudication directs that the income from this trust shall be invested as received.[6] Ordinarily, stocks and bonds produce income quarterly. Moreover, most of the instant trust is presently invested in common trust fund of the trustee which reinvests income monthly.

In geometric progression, even the slightest variation produces an astounding result. For example, money compounded annually at six percent doubles in

---

[6] Readjudication, page 24.

11.9 years; at five percent it doubles in 14.2 years; at four percent it doubles in 17.7 years; and at three percent it doubles in 23.4 years.[7] Therefore, in the instant case, each additional percent of interest compounded annually increases by approximately 1,000 percent the total corpus at the end of 400 years. In point of fact, calculated at six percent annually, the corpus of the instant trust will amount to $19,242,724,745 in 2063; calculated at five percent annually it will amount to $1,595,511,171; calculated at four percent annually the total will be $150,414,516; and calculated at three percent annually the corpus will be $16,270,940. Compounding quarterly or monthly, instead of annually, considerably increases the final product, e.g., calculated at four percent quarterly the corpus in the instant case will reach $172,832,168.[8]

It is to be noted that the intangible factors of growth in investments, change in the purchasing power of the dollar, impact of taxation,[9] compensation to trustee, etc., have not been considered in the estimated eventual size of the corpus of this trust. These imponderables are as ephemeral as everything else in this unrealistic case. In any event, it appears from the foregoing that if this trust is permitted to accumulate as contemplated by testator, unfettered by law, the corpus in 2063 could reach the spectacular sum of $19,000,000,000; it should, at least, attain $172,000,000; and, in addition, enormous accumulations will be available for distribution every 20 years as the trust nears its end.

---

[7] Rates supplied by statistical department of Germantown Saving Fund Society. See also the World Book, 1939 vol. 9, page 3475.

[8] These calculations have been made at the request of the writer of this opinion by a university professor proficient in higher mathematics.

[9] Internal Revenue Code, sections 501(c)(3), 504 and 681. See "The Legal Problem of Accumulation," by Robert H. Mulreany, Bulletin of the Foundation Library Center for March 1963, on the Federal taxability of unreasonable accumulations for charities.

A few weeks ago, Major Cooper orbited the earth 22 times, traveling over half a million miles in little more than one day. Four hundred years ago, Columbus took 70 days to complete his first adventurous voyage to the West Indies. Four hundred years ago, water passage was by sailboat and land transportation was by oxen, horse-drawn cart, horseback or foot. Unheard of were vehicles and machines propelled by steam, electricity, gasoline, diesel, jet or nuclear power. Undiscovered were the telephone, radio, television and modern miracle drugs. What testator, writing his will in 1560, could have envisioned these scientific advances, or the needs of today?

In this nuclear age, it would be an exercise in futility to attempt to predict the needs or role of charities in the year 2360. Will our law then permit the operation of charities supported by private contributions? Will the Masonic Homes in Elizabethtown still be in existence? What will they do with this enormous fund? It is true that the Masonic Order has been in existence for hundreds of years. However, the present method of caring for the aged, splendidly exemplified by the Masonic Homes at Elizabethtown, is of relatively recent origin. What will be the accepted means of caring for the aged in 2360? What of Medicare? What charitable institution of 1560 is still operating today? In sum, is it not unwise and presumptuous for us today to anticipate the needs, or even the kind of society 400 years hence?

Is the majority's decision correct that under the Pennsylvania statute against accumulations this court is impotent to prevent the unreasonable accumulation directed in the instant trust?

Free alienability of property is a cardinal principle of Anglo-American law: Lauderbaugh v. Williams, 409 Pa. 351. Its most common expressions are the rule against perpetuities and the rule against accumula-

tions. The latter rule has been adopted in many jurisdictions by common law: Gertman v. Burdick, 123 F. 2d 924 (C. C. A. D. C.) ; Tumlin v. Troy Bank & Trust Co., 258 Ala. 238, 61 So. 2d 817; Hoadley v. Beardsley, 89 Conn. 270, 93 Atl. 535; Kimball v. Crocker, 53 Me. 263. Other jurisdictions have enacted the rule by statute.[10]

The rationale of the rule against accumulations is cogently stated in the comment to section 441 of the Restatement of the Law of Property, vol. IV, p. 2580:

"The rule stated in this Section is one product of the underlying social policy which forms the background . . . of this rule . . . namely, the desirability of preserving property free from inconvenient fetterings. Just as it is inconvenient to society, for a property owner to interfere too long with the alienability of property by the creation of uncertain future interests, so also, and more so, it is inconvenient to society, for a property owner to direct an accumulation, . . . as for example, by creating a trust providing that, for long periods of time, the current income of the trust be retained, or be so applied as to increase the fund subject to the trust. This amassing of wealth is in derogation of the reasonable expectations of the owners of the property for the time, that they shall receive its current earnings. Such a growth of trusteed funds constitutes a potential social disadvantage."

In many jurisdictions, the rule against accumulations has been less strictly applied to charitable trusts, either by case law or by statute. However, textwriters

---

[10] Thelluson Act 39 and 40, George IV, C. 98, adopted in England in 1800; Alabama Code of 1940, Tit. 47, §146; Arizona, 11 Ariz. Rev. St. Anno. §33-238; California Civil Code §724; Illinois (Smith Hurd), 30 Ill. Anno. St. 153; Minnesota Stats. 500.17; Montana Rev. Code of 1947, 67-412; New York Laws, 1961, C. 866, North Dakota Code 47-03-02; South Dakota Code of 1939, 51.0307; and Wisconsin, 27 W. S. A. Sec. 230.37.

persuasively argue that every provision for accumulation of income for charitable trusts must be "reasonable" to be upheld. Typical is the view of Professor Scott, in his monumental treatise, Trusts, vol. IV, 2d ed, §401.9, pp. 2886, 2889:

"Clearly, however, *it would be against public policy to permit accumulation for too long a period, during which period no useful disposition would be made of the property or its income.*

". . . Where property is given upon an unconditional trust for charitable purposes but it is provided that the income shall be accumulated for a certain time, the American courts have generally held that the provision for accumulation is binding *unless under all the circumstances the period of accumulation is unreasonably long . . .*" (Italics supplied.)

The comment to section 442 of the Restatement of the Law of Property, vol. IV, p. 2586, states:

". . . provisions for accumulations in favor of charity are free from the definite restrictions imposed, under the rule stated in §441, on accumulations in favor of a non-charity, and are valid, *unless it is judicially determined that the period of the accumulation in question is unreasonable* in the light of the facts and circumstances of the particular limitation." (Italics supplied).

Philip A. Bregy, Esq., one of the draftsmen of the act, in his article "The Accumulations Provision in the Proposed Estates Act of 1947", 95 U. of Pa. Law Rev. 144, 153 (1946) states:

". . . No doubt the courts will continue to strike down the brain children of eccentric testators and settlors for one reason or another. It is even *conceivable that an implied condition of reasonableness will be read into the statute.*" (Italics supplied.)

And Simes and Smith, The Law of Future Interests, 2d ed., 1956, vol. III, §1467, state:

". . . If a trust for charity is vested, a provision for accumulation of income is valid and will be effectuated so long as it is not *unreasonable* . . . The charitable trust is subject to the directions of the court of equity; and, *if the accumulation should become unreasonable, the court has power to direct the trustee to disregard it.* Thus the charitable trust will be sustained, and objectionable features will be prevented by *subjecting it* to the control of the court." (Italics supplied.)

To the same effect are 10 Am. Jur., Charities §21; 2 Bogert on Trusts §332, and 41 Harv. Law Rev. 514.

The case law in sister States applies the "reasonableness" test in determining the validity of charitable accumulations: Quinn v. Peoples Trust & Savings Co., 223 Ind. 317, 60 N. E. 2d 281, 287; Waterbury Trust Co. v. Porter, 131 Conn. 206; Penick v. Bank, 218 N. C. 686; Frazier v. Merchants Nat. Bank of Salem, 296 Mass. 298, 5 N. E. 2d 550; Schreiner v. Cincinnati Altenheim, 61 Ohio App. 344, 22 N. E. 2d 587; Collins v. Lyon, Inc., 181 Va. 230, 24 S. E. 2d 572, and Wendell v. Hazel Wood Cemetery, 7 N. J. Super. 117.

The language used in these cases is exemplified by St. Paul's Church v. Attorney General, 164 Mass. 188, 204, viz:

"We are of opinion, however, that the proper course is to hold that the limits of an accumulation for the benefit of a charity are subject to the order of a court of equity. By this method of solving the difficulty, on the one hand *an unreasonable and unnecessary trust for accumulation can be restrained,* and on the other hand a reasonable accumulation can be allowed to carry out the intention of the benefactor and to secure the accomplishment of the trust in the best manner." (Italics supplied.)

Applying the "reasonable" test, courts have stricken down accumulations for charity which they found to be

*unreasonable:* e.g., Pelton v. First Savings & Trust Co., 98 Fla. 748. In that case, testator directed that one-half of the income from the residuary trust be paid to Hillsborough County Humane Society and the other half be added to the corpus annually. The direction to accumulate was held invalid, and the second half of the trust corpus was awarded to testator's heirs.

Other courts have refused to strike down charitable accumulations which they found to be *reasonable* or *not unreasonable:* Allaun v. First & Merchants National Bank, 190 Va. 104, 56 S. E. 2d 83; Lyme High School Association v. Alling, 113 Conn. 200; Odell v. Odell, 10 Allen 1 (Mass.). There may be a difference of opinion as to whether these accumulations were *"reasonable"* or not *"unreasonable"*. However, the important point is that each court applied the "reasonable" test. Moreover, we have not discovered any case holding that courts *lack the power* to strike down or vary an unreasonable accumulation.

We come to the Pennsylvania statute (section 6 of the Estates Act of April 24, 1947, as amended February 17, 1956), which the majority holds to be an impregnable barrier in the instant case. It provides:

"(a) General. No direction or authorization to accumulate income shall be void, except as herein provided.

"(b) Void Accumulations; Exceptions. Upon the expiration of the period allowed by the common law rule against perpetuities as measured by actual rather than possible events, any direction or authorization to accumulate income shall be void.

"This subsection shall not apply to:

"(1) Directions or authorizations to accumulate income in a trust for any charitable purpose or purposes."

The Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 52, provides, inter alia:

". . . In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions, among others:

"(1) That the Legislature does not intend a result that is absurd, impossible of execution, or unreasonable;". . .

Therefore, in construing the quoted statute against accumulations as it applies to charities, this court has a duty to construe it so as not to produce an "absurd" or "unreasonable" result. Let us examine the language of this statute in the light of this mandate from the Legislature and the history of the statute.

Until the enactment of the Estates Act of 1947, the rule against accumulations was quite strictly applied in Pennsylvania. Accumulations were permitted only during minority: Carson's Appeal 99 Pa. 325. This was extended to the lifetime of settlor: Sinkler Estate, 3 D. & C. 2d 241. Many provisions in wills or deeds of trust, directing accumulations beyond minority, e.g., "until my son is age 25", were stricken down. In this climate, the Joint State Government Commission recommended, and the legislature adopted, an extension of the rule against accumulations to the well-established period of the rule against perpetuities. However, the commission was of the opinion that the latter period should not necessarily be the limit for proper accumulations for charities. Hence, the exception in subsection (1) of the statute in question.

Both the history and the language of the act indicate that the rule against perpetuities measures accumulations generally, but that the rule does not set the terminus of "Directions or authorizations to accumulate income in a trust for any charitable purpose or purposes". In short, all accumulations which extend beyond the period set by the rule against perpetuities are *void*, except accumulations for charitable purposes or in pension trusts; but such excepted accumulations are not, per se, *void*. However, the statute does not

specify that *all* charitable accumulations are *valid*. A double negative does not constitute an unlimited positive. To so argue is to fall into the syllogistic trap of the undistributed middle.[11]

Frequently, the courts interpret the term "void" to mean "voidable", or "void under certain circumstances". To ascribe this meaning to the term "void" would empower this court to apply the "reasonable" test. And it is well established that this is a statutory court with equitable powers: Webb Estate, 391 Pa. 584, 586.

In view of the mandate of the Statutory Construction Act that the legislature is presumed not to "intend a result that is absurd. . . or unreasonable", this court should not construe the statute against accumulations to produce the clearly "unreasonable" result of the present will, unless this is the meaning of the statute. That the meaning of the act is not clear is evidenced by the fact that this court is evenly divided. Since there is doubt as to the interpretation of this statute, the presumption of the Statutory Construction Act applies. It follows that the statute does not prohibit the application of the "reasonable" test. This is proper statutory construction, not judicial legislation.

This interpretation of the statute conforms with past practice of the Pennsylvania courts, which have repeatedly applied the "reasonable" test to accumulations for charity, either expressly or impliedly. There have been specific reasons or objectives for the accumulation which have justified the court's approval of sustained accumulations for a reasonable period of time.

Thus, in Lennig's Estate, 154 Pa. 209, accumulation of income upon a fund of $600,000 was permitted until the corpus reached $700,000, the amount testator directed to be distributed to the University of Pennsyl-

---

[11] See syllogism of readjudication, page 13.

vania, to further the bequest of John H. Towne for
science, research and free scholarship for students.

Similarly, in Archambault's Estate, 308 Pa. 549, the
trustees were authorized to comply with testator's
direction to accumulate income until a sufficient fund
was created to endow a rent-free pew in testator's
church.

Likewise, in List Trust, 6 Fiduc. Rep. 119, President
Judge Klein authorized the accumulation of income to
establish and perpetuate an endowment fund in a
church which had resisted the establishment of such
fund. He held that the encouragement to give which
this trust, created by its rector, supplied to the mem-
bers of the church, constituted a reasonable basis for
the accumulation.

So, also, in Balch Estate, 21 D. & C. 2d 97, President
Judge Klein held valid a provision of testatrix' will to
accumulate income for the purpose of endowing and
maintaining a free library. The fund then exceeded
$2,000,000. At the time of the audit, testatrix' aspi-
rations were readily in sight; they have now, in fact,
been reached.

The readjudication concedes: "The auditing judge
has not been shown any case where a court has upheld
accumulation of income for a period of 400 years." [12]
The few cases in the books involving long-term accum-
lations which have been upheld are readily distin-
guishable.

The majority makes reference to Benjamin Frank-
lin's famous will. It is probably the most extreme
illustration of accumulation of income in the books.[13]

[12] Readjudication, page 19.

[13] The Erie Endowment v. United States of America, 202 F.
Supp. 580 (U. S. D. C. W. D., Pa.); and Holdeen v. Ratterree,
292 F. 2d 338 (U. S. C. C. A. 2nd), involve accumulations over
lengthy periods. However, the question at issue was their taxability,
not their validity under the statute against accumulations.

This will has been sustained in Benjamin Franklin's Estate, 27 W. N. C. 545, and 150 Pa. 437; Benjamin Franklin Administratrix v. City of Philadelphia, 2 Dist. R. 435; City of Boston v. Doyle, 184 Mass. 373, 68 N. E. 851. However, none of these cases specifically ruled upon the point now at issue. Moreover, in Benjamin Franklin's Estate, supra, 27 W. N. C. 545, 548, the illustrious Judge Penrose quoted with approval Gray on Rule Against Perpetuities, viz:

" 'And where there is an unconditional gift to charity, the gift will be regarded as immediate and good, although the particular mode of carrying out the charity which the donor has indicated is too remote. Consequently, in such a case, *if a direction for accumulation is too remote, the only result is that the income is immediately distributable in* charity; the heirs or next of kin are not let in.' " (Italics supplied.)

It is notable that the corpus and the accumulated income in Dr. Franklin's trust were to be put to work immediately and continuously throughout the 200 years of its existence to afford assistance to young and impecunious artificers by providing them with loans at five percent interest, which was less than the current rate, and without collateral security. How different the instant case, where a portion of the accumulations is to lie idle for 400 years! As suggested by the courts, there may be real significance in marking, by then making distribution of this trust, the two hundredth anniversary of the death of Benjamin Franklin, statesman, philosopher, writer, scientist, educator and one of America's most illustrious citizens. There is no comparable patriotic interest in celebrating in 2360 the four hundredth anniversary of the death of Frank James. This court should not permit James to satisfy his vanity in this unreasonable manner.

A further key question arises in this case: Is the instant trust in "relief of poverty, the advancement of

education, the advancement of religion, the promotion of health, governmental or municipal purposes, . . . the accomplishment of which is beneficial to the community", the definition of "charity" in section 1 of the Estates Act of 1947? The community will reap only a fractional benefit from the instant trust for centuries. The public burden of caring for the aged will *not* be "relieved" by the accumulation of a portion of the income from this trust for 400 years. Moreover, the accumulation of income for successive 20-year periods before distribution has no reasonable purpose. It prevents rational, regular use of the income for the maintenance of a constant number of guests in the Masonic Homes. It follows that the accumulations will not be "beneficial to the community" within the statutory definition of "charity". Hence, the instant trust is *not* a charitable trust within the statute, and the exception of subparagraph (1) thereof does not apply. Likewise, it should not receive the exemption from taxation and other special privileges granted to charities.

In summary, the "reasonable" test is generally accepted and applied throughout the United States. It is approved by textwriters. Analysis of the Pennsylvania statute and cases fails to disclose clear legislative or judicial policy to set the law of Pennsylvania apart from that of the other States on this subject. It follows that this court has the power and the duty to apply the "reasonable" test to charitable accumulations. This historic court, founded by Penn on the pattern of the famous Court of Orphans in London and grounded in the application of equitable principles, is not impotent to vary a trust which will continue until the accumulations reach astronomical size 400 years from now.

I conclude, therefore, that the direction in the instant will to accumulate part of the income from this $50,000 trust for 400 years before putting it to work and to withhold the remaining accumulations for 20-year pe-

riods is *unreasonable*. It follows that this trust fund should be put to direct, immediate, charitable use. The appropriate use is to apply the income at once to the maintenance and operation of the exemplary Masonic Homes in Elizabethtown. In the exercise of its well-established powers of general supervision of trusts and cy pres, this court could, and should, do this. I would do it.

Hence, I dissent.