Thomas Essler et al., Petitioners *v.* William R. Davis, Secretary of the Commonwealth et al., Respondents.

James L. Buckman et al., Petitioners *v.* William R. Davis, Secretary of the Commonwealth et al., Respondents.

Heard by President Judge CRUMLISH, July 10, 1980.

*James J. O'Connell*, with him *Vito F. Canuso, Jr.*, and *Herbert W. Salus, Jr.*, for petitioners.

*Velma A. Boozer*, Assistant Attorney General, with her *David F. Phifer*, General Counsel, for respondents.

MEMORANDUM OPINION BY PRESIDENT JUDGE CRUMLISH, August 27, 1980:

These two petitions for review in the nature of mandamus actions, consolidated for argument, involve an interpretation and application of Section 979 of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, Art. IX, §979, *as amended*, 25 P.S. §2939, concerning substituted nominations for public office. We reject both petitions.

On June 16, 1980, nomination petitions were filed in the office of the Secretary of the Commonwealth for Republican candidates, James L. Buckman, Second Congressional District of Pennsylvania, United States Congress, and Thomas Essler, Pennsylvania State Legislator, 202nd House Legislative District. The Commissioner of Elections for the Commonwealth, by letter dated June 24, 1980, notified the Chairman of the Philadelphia Republican City (County) Committee that the Election Code precluded acceptance of the Nomination Certificates as filed. The Commissioner explained that Section 979 does not allow substituted

nominations where either a candidate's withdrawal arose *before* the primary or where no nomination had been made, but applies only to those circumstances where nominated candidates had withdrawn or *died* after the primary.

Since each case turns upon a differing set of factual circumstances, we will deal with them separately.

*Buckman Petition—No. 1573 C.D. 1980*

On or before February 11, 1980, the last date for filing nomination petitions for the Republican Primary Election to be held April 22, 1980, Irwin N. Wardlaw filed for the Office of United States Congressman for the Second District of Pennsylvania. On February 20, 1980, the last date for withdrawing petitions, Wardlaw filed a withdrawal of his nominating petition. Consequently, no candidate appeared on the April 22nd Republican Primary Ballot. Subsequent to the Primary Election, the Republican City Committee filed the nomination certificate for Congressional candidate Buckman.

Petitioners argue that this refusal to allow Buckman's nomination certificate causes undue hardship to the electorate of the Second Congressional District by destroying the political identity of one of the candidates. They contend that the Commissioner inadvertently and erroneously subverts the Election Code's clear intent to preserve the party system and dramatically illustrates the warning language in *Oberleitner v. Bolinger*, 42 Pa. D. & C. 2d 623, 629 (1967):

> [T]o hold that a primary candidate may withdraw at any time before the election without sound and sufficient reason would expose the electorate to possibility of political abuse and undesirable election practices. It would permit the unscrupulous to file as a candidate in order to bargain for favor and promise of re-

ward for quitting the race. It conceivably might open the door to rigging of primary elections through political dealings between party factions and primary opponents whereby belated withdrawals are attempted and contrived in order to secure the election of a less capable candidate who otherwise could not command a plurality of votes. Also within the scope of possible political abuse is the chance that some candidates might be forced to run the gauntlet of coercion, fear and intimidation as long as possibility of withdrawal exists. Equally to be condemned is the opportunity afforded a possible candidate to test the whims of public sentiment before making an actual, final decision relative to seeking public office. A citizen is under no obligation to seek election to office and may be a candidate or refuse to be such at his option. But, having exercised his option by filing nomination petitions for public office, the electorate has the right to demand of him not to play fast and loose with orderly election processes and make a mockery of them.

With these words of insight and wisdom, we find no fault. However. the Petitioners fail to clearly recognize the mandated purpose of the political primary system as we view it.

The Election Code's Article IX, imperfect as it may be, is the product of over 80 years of legislative consideration and edict, all directed to preserving the sanctity of the political primary system. In *Commonwealth ex rel. Kinsey v. Blankenburg*, 218 Pa. 339, 340, 67 A. 645, 645 (1907), the Supreme Court in examining the pioneering Uniform Primary Act of 1906 astutely observed:

The Act of Feb. 17, 1906, P.L. 36, is an enactment to systematize, regulate and put under

control of positive law party nominations for public office. It is the latest of a series of statutes extending the direct and immediate control of law over methods and details of the exercise of the elective franchise which previously had been left in the unrestricted discretion and control of individuals or party managers. Under the earlier system, ballots were prepared by individuals or party officers in any form they desired; nominations were made by party machinery, usually conventions, under party rules and at irregular dates. Justly or unjustly, these steps, which practically controlled nominations and elections, were exposed to the suspicion of manipulation, not for the convenience of party voters alone, but for undue advantage to individuals and party cliques.

The Act of 1906 was passed to put an end to this system.

The Supreme Court determined that the Act did provide a uniform Commonwealth primary election system which would serve the best interests of all the people, and not just the politicians' preferences.

The Commonwealth replies that the Election Code's Section 979 language clearly limits substituted nominations:

Any vacancy happening or existing *after the date of the primary* in any party nomination, by reason of the death or withdrawal of any candidate after nomination, or by reason of the death before or on the day of the primary election of a candidate for nomination who had received a plurality of votes of his party electors cast for the office for which he sought nomination, may be filled by a substituted nomination made by such committee as is authorized by the rules of the party to make nominations in the

> event of vacancies on the party ticket. . . . (Emphasis added.)

and that our case law has proven that no other cause for the substituted filling of a vacancy has been provided by law. We agree.

We have been unable, after exhaustive review, to find distinctions, differences or qualifications which would contravene the clear legal election process established by the Code. In *Commonwealth ex rel. Meyers v. King, Secretary of the Commonwealth*, 6 D. & C. 155, 160 (1924), we find the support for this proposition:

> The Uniform Primaries Act of 1906 and 1913 were passed to abolish the method of nominating candidates for office by party conventions and party committees theretofore in vogue and to substitute a method for all nominations and for all political parties at primaries to be held at the same time, at which all members of the respective parties should have an opportunity to vote. . . . The general tenor of the act shows the intent of the legislature to be that all nominations must be made at those primaries by the vote of the party members. . . . If no nomination is made when a nomination could have been made at the primary election, then no vacancy can happen or exist under the law. Any other construction would defeat one of the main purposes of the Primaries Act.

Moreover, in *Watson v. Witkin*, 343 Pa. 1, 22 A.2d 17 (1941), the Supreme Court, in a highly controversial and celebrated ruling, held that the political parties of the City of Philadelphia had no more authority to make a candidate selection for the office of Mayor, under the contingency of the candidate's death 18 days before the primary than they would have to select

candidates for the Mayor of Pittsburgh. Discussing Section 979 of the Code, the Court concluded:

Nothing can be clearer than the fact that under this provision an authorized party committee can make a substituted nomination only if a vacancy happens *after* the date of the primaries. The vacancy giving rise to this case happened twenty-two days *before* the primaries and was *not* in any party nomination. The authorized party committee can make *substituted* nominations *only when the duly nominated candidate of the party dies or withdraws as a candidate.* Before there can be a 'substituted nomination, there must have been a nomination.'

*Id.* at 10, 22 A.2d at 121.

Although the result we reach may seem inequitable at first blush, we must follow the clear exposition of *Watson* and conclude that substituted nominations for vacancies before the primary would contravene the very spirit of our election laws. We are wont to broadened interpretation to give the greatest latitude of choice to the greatest numbers, but we are bound to interpret our laws and not legislate them.

### *Essler Petition, No. 1570 C.D. 1980*

We are asked here only to determine whether a substitute nomination certificate may be filed to fill a vacancy caused by the political party's failure to make any nomination at or before a primary election.

In *Commonwealth ex rel. Meyers v. King, Secretary of the Commonwealth, supra,* the Dauphin County Common Pleas Court, sitting as the Commonwealth Court, dismissed a mandamus to compel the receipt and filing of a substituted nomination paper for the Progressive Party's Eighteenth Congressional District candidate. The September 19, 1929 nomination petition recited that the vacancy occurred after the

April 22nd primary due only to the Party's failure to nominate a candidate. In attacking the Party's behavior, the Court held, as we do here:

> To permit party members to fill vacancies through party committees after the primaries, where such vacancies occur because of the failure of party members to make nominations, would open the door to a connivance between party leaders with a view to discouraging and omitting the making of nominations at the primaries, in order that they may be made by party committees in the old way.

Accordingly, we

### ORDER

Now, August 27, 1980, the petitioners' respective petitions for review and writs of mandamus are denied.